Lillian Kamler, et al. [1] v. Commissioner. Kamler v. Commissioner
Docket Nos. 1463-64, 1464-64, 1506-64.
United States Tax Court
T.C. Memo 1966-46; 1966 Tax Ct. Memo LEXIS 235; 25 T.C.M. (CCH) 260; T.C.M. (RIA) 66046; March 3, 1966
*235 Held, petitioners' losses resulting from satisfaction of their obligations as guarantors of the indebtedness of Wobbers, Inc., a corporation in which they were shareholders, to the Bank of America are nonbusiness bad debt losses deductible only under section 166(d) of the Internal Revenue Code of 1954 as short-term capital losses. Putnam v. Commissioner, 352 U.S. 82. Gino P. Cecchi, 665 Van Ness Ave., San Francisco, Calif., for the petitioners. James E. Merritt, for the respondent. ARUNDELL
Memorandum Opinion ARUNDELL, Judge: *236 Respondent determined deficiencies in income tax for the calendar year 1961 in amounts as follows: Docket
Petitioner
No.
Deficiency
Lillian Kamler
1463-64
$704.00
Milton Kamler
1464-64
704.00
Juanita Petrucci
1506-64
635.13
*237 Each petitioner assigned error as follows: (a) In determining the taxable income of the petitioner for the year 1961, the Commissioner erroneously disallowed a deduction of FIVE THOUSAND DOLLARS ($5,000.00) representing a loss due to the payment by the petitioner of a debt of a defunct corporation which had been guaranteed by the petitioner. Commissioner contends that this loss is a non-business bad debt to be treated as a short term capital loss. All of the facts have been stipulated and are found accordingly. Petitioners Milton Kamler and Lillian Kamler are husband and wife, each of whom filed a separate individual Federal income tax return for the year 1961 with the district director of internal revenue at San Francisco, California. Petitioner Juanita Petrucci is the wife of Ernest J. Petrucci. She filed a separate individual Federal income tax return for the year 1961 with the district director of internal revenue at San Francisco, California. Prior to August 30, 1957, Frederick J. Molteni, Milton Kamler, Ernest J. Petrucci and Edward F. Nightingate operated a stationery and printing business as a partnership under the firm name of Wobbers. On August 30, 1957, that business *238 was incorporated under the laws of the State of California. The name of the corporation was Wobbers, Inc. The corporation had an authorized capital stock of 4,500 shares of Class A common (voting) and 50,000 shares of Class B common (non-voting). The par value of both classes was $10 per share. Of the authorized stock the corporation issued 3,000 Class A shares and 6,342 Class B shares to the following individuals for consideration as follows: Individual
Class A
Class B
Consideration
Frederick J. Molteni
600
2,605
Partnership assets
$32,050
Milton Kamler
600
1,965
Partnership assets
25,650
Ernest J. Petrucci
600
1,544
Partnership assets
21,440
Edward F. Nightingale
600
78
Partnership assets
6,780
Marvin Hilliker
600
150
Cash
7,500
Totals
3,000
6,342
$93,420
Milton Kamler was first vice president of Wobbers, Inc. The stock issued to him was held as the community property of Milton Kamler and his wife, Lillian Kamler. Ernest J. Petrucci was treasurer of Wobbers, Inc. The stock issued to him was held as the community property of Ernest Petrucci and his wife, Juanita Petrucci. By resolution of the board of directors dated *239 January 18, 1958, Wobbers, Inc., was authorized to borrow up to $100,000 from the Bank of America. On January 28, 1958, Frederick J. Molteni, Milton Kamler, Ernest J. Petrucci, and Edward F. Nightingale and their respective spouses executed a document entitled "Continuing Guaranty." Among other things this guaranty provided: To BANK OF AMERICA * * *
(1) For valuable consideration, the undersigned (hereinafter called Guarantors) jointly and severally unconditionally guarantee and promise to pay to BANK OF AMERICA * * * (hereinafter called Bank), or order, on demand, in lawful money of the United States, any and all indebtedness of WOBBERS, INC. * * * (2) The liability of Guarantors shall not exceed at any one time the sum of ONE HUNDRED THOUSAND AND NO/100 Dollars * * * On July 24, 1958, Wobbers, Inc., executed a promissory note in the amount of $90,000 to the Bank of America. The proceeds of the note were used to renew prior loans of $63,999.90 and to provide additional funds of $26,000.10. In August 1958 the Bank of America and several of the officers of Wobbers, Inc., became concerned with the inability of Wobbers, Inc., to pay its liabilities. At this time certain *240 of the officers of Wobbers, Inc., sought to obtain extensions of credit from suppliers and to provide additional capital investment in the company. Subsequently, the financial position of Wobbers, Inc., worsened and the Bank undertook steps to secure its position. On January 19, 1959, Milton and Lillian Kamler executed a continuing guaranty of the indebtedness of Wobbers, Inc., to the Bank of America, up to $100,000, which was secured by a deed of trust upon their personal residence, naming the Bank of America as beneficiary. Among other things this guaranty provided: To BANK OF AMERICA * * *
(1) For valuable consideration, the undersigned (hereinafter called Guarantors) jointly and severally unconditionally guarantee and promise to pay to BANK OF AMERICA * * * (hereinafter called Bank), or order, on demand, in lawful money of the United States, any and all indebtedness of WOBBERS, INC. * * * (2) The liability of Guarantors under this guaranty shall not exceed at any one time the sum of ONE HUNDRED THOUSAND AND NO/100 Dollars * * * On January 19, 1959, Ernest and Juanita Petrucci also executed a continuing guaranty of the indebtedness of Wobbers, Inc., to the Bank *241 of America, up to $100,000, which was secured by a deed of trust upon their personal residence, naming the Bank of America as beneficiary. This continuing guaranty was in all material respects the same as the one executed by Milton and Lillian Kamler. Frederick J. Molteni and Edward F. Nightingale and their respective spouses also executed continuing guaranties on January 19, 1959, secured by deeds of trust upon their personal residences. In view of the financial difficulties of Wobbers, Inc., and the execution of the above-mentioned guaranties and deeds of trust, the Bank of America agreed to reduce the payments due it upon the promissory note of Wobbers, Inc., from $2,500 per month to $1,200 per month and to extend the due date on that note from July 24, 1959, to March 1, 1960. By May 6, 1959, a Creditors' Committee had been formed in order to salvage as much as possible of the remaining assets and business of Wobbers, Inc. On that date a letter from the Creditors' Committee was sent to the creditors of Wobbers, Inc., which letter summarized the financial position and history of Wobbers, Inc., and requested an an agreement of the creditors to provide an extension of credit *242 to Wobbers, Inc. Effective as of March 9, 1959, the stockholders of Wobbers, Inc., and its major creditors entered into an extension agreement as proposed in the above-mentioned letter dated May 6, 1959. This agreement provided that the creditors would grant an extension of credit. In return, the shareholders agreed to pledge their stock to Albert J. May who was empowered to liquidate the assets of Wobbers, Inc., if its financial position did not improve. The creditors were to be paid in full before the stockholder-pledgors would participate in the liquidation. The stockholders also agreed to capitalize amounts then due them from Wobbers, Inc. The financial condition of Wobbers, Inc., did not improve and the creditors proceeded to liquidate the assets of Wobbers, Inc. Pursuant to the pledge of shares, Albert J. May elected new officers and directors and changed the name of Wobbers, Inc., to Fremont Liquidating Corporation. On October 29, 1959, the major portion of the assets of Wobbers, Inc., was sold to H. S. Crocker Co. for a price substantially below book value. On June 6, 1960, the Bank of America notified the guarantors that the dividend it expected to receive from the *243 Committee of Creditors would be extremely small and that the guarantors should meet with the Bank to arrange the liquidation of their liability. Subsequently, the guarantors and the Bank of America conducted negotiations with respect to the amount the guarantors should pay in satisfaction of their liabilities under their guaranties. In negotiating the amount the guarantors should pay in satisfaction of their liabilities under the guaranties, the Bank of America hesitated to foreclose upon the guarantors' deeds of trust because of their past cooperation, relatively old age, limited resources, lack of earning potential, and for other reasons. On the other hand, the guarantors resisted collection of the full amount because the manner in which the guaranties of January 19, 1959, and deeds of trust were obtained would support the position that such guaranties and deeds of trust were invalid because the Bank gave no consideration therefor. On March 7, 1961, the Bank, through J. B. Grassens, assistant vice president, addressed a letter to the attorney (Charles P. Molinari) who was representing the guarantors, the body of which letter was as follows: Considering the impasse reached *244 by your clients in coming up with the cash, I have no alternative but to notify you that unless the settlement is consummated within 20 days from date, our offer of settlement is to be considered withdrawn and I will be forced to file Notice of Default and proceed with foreclosure of our deeds of trust. I can well appreciate and sympathize with you in your problem in getting your guarantors together. However, there necessarily has to be a time limitation placed to consummate any settlement, particularly when substantial concessions have been made. At this time, the net value of the assets subject to deeds of trust which were security for the guarantors' performance exceeded the amount due from Wobbers, Inc., to the Bank of America of $60,800. The Bank estimated that the quick sale values of the guarantors' residences were as follows: Net Quick
Guarantors
Sale Value
Moltenis
$17,650
Nightingales
8,000
Kamlers
21,000
Petruccis
16,500
$63,150
On April 13, 1961, the guarantors paid $40,000 to the Bank of America in exchange for the reconveyance of their deeds of trust and the release of their guaranties of January 28, 1958, and January 19, 1959. *245 Milton and Lillian Kamler paid $10,000 of the total of $40,000. Each claimed a deduction of $5,000, their one-half community property share, as a "Business Loss Sustained as a Guarantor" on their returns for 1961. Ernest and Juanita Petrucci paid $10,000 of the total of $40,000. Juanita Petrucci claimed a deduction of $5,000, her one-half community property share, as a "Business Loss Sustained as a Guarantor" on her return for 1961. Upon receipt of the payment of $40,000 by the guarantors, the Bank of America reduced the amount due it from Wobbers, Inc., upon the promissory note executed July 24, 1958, by $40,000. On April 13, 1961, the Bank of America received a first dividend upon liquidation from the Committee of Creditors of $1,215. The Bank received a second and final dividend of $1,274.37 in June 1962. The remaining balance due from Wobbers, Inc., of $18,309.63 was then closed as a loss by the Bank of America. In the deficiency notice addressed to each of the three petitioners, the respondent disallowed the claimed deduction by each petitioner of $5,000 and allowed instead thereof a capital loss limited to $1,000. In a statement attached to each deficiency notice, the *246 respondent explained his adjustment in part as follows: (a) It is held the loss sustained by you arising from payment as a guarantor of the obligations of the now defunct corporation, Wobbers, Inc., represented a nonbusiness bad debt to be treated as a short-term capital loss, rather than a business bad debt and an ordinary loss as claimed on your return. Accordingly, your community one-half share of the loss claimed in the amount of $5,000.00 has been disallowed as an ordinary loss and has been considered as a capital loss * * * allowable in 1961 limited to $1,000.00. Petitioners, in their brief, say "The only issue for determination is whether the amount so paid by the Petitioners is to be classified as an ordinary loss resulting from a transaction entered into for profit and thus deductible in full or as a non business bad debt and thus deductible as a short term capital loss." From the petitioners' standpoint, the applicable section of the Internal Revenue Code of 1954 would be section 165(a) and (c)(2). [2] From respondent's standpoint, the applicable sections of the 1954 Code are sections 166(d); 165(f); and 1211(b). [3]
*247 The issue here presented for our determination is substantially the same as that decided by the Supreme Court in Putnam v. Commissioner, 352 U.S. 82, affirming 224 F. 2d 947 (C.A. 8, 1955), which in turn affirmed a Memorandum Opinion of this Court. The statutes involved in the Putnam case were sections 23(e)(2) and 23(k)(4) of the 1939 Code which are the forerunners and substantially the same as sections 165(c)(2)and 166(d) of the 1954 Code, respectively. In the Putnam case the taxpayer, like the petitioners herein, had incurred a loss in discharging his obligation to a bank, as guarantor of notes of a corporation of which he was a stockholder; and in that case, like the present, the issue was whether the taxpayer's loss was deductible in full under section 23(e)(2) of the 1939 Code [which is substantially the same as section 165(c)(2) of the 1954 Code]; or whether it represented a loss incurred on a nonbusiness bad debt within the meaning of section 23(k)(4) of the 1939 Code [which is substantially the same as section 166(d) of the 1954 Code], which was deductible only as a short-term capital loss. The Supreme Court held that the loss was deductible *248 only as a nonbusiness bad debt. It stated, in part: The objectives sought to be achieved by the Congress in providing short-term capital loss treatment for non-business bad debts are * * * persuasive that section 23(k)(4) applies to a guarantor's nonbusiness debt losses. The section was part of the comprehensive tax program enacted by the Revenue Act of 1942 to increase the national revenue to further the prosecution of the great war in which we were then engaged. * * * His [Putnam's] venture into the publishing field was an investment apart from his law practice. The loss he sustained when his stock became worthless, as well as the losses from the worthlessness of the loans he made directly to the corporation, would receive capital loss treatment; the 1939 Code so provides as to nonbusiness losses both from worthless stock investments and from loans to a corporation, whether or not the loans are evidenced by a security. It is clearly a "fairer reflection" of Putnam's 1948 taxable income to treat the instant loss similarly. There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the *249 form of a guaranteed bank loan. The tax consequences should in all reason be the same, and are accomplished by section 23(k)(4). [Footnotes omitted and emphasis supplied.] We do not think the issue here considered is distinguishable in principle from the issue decided in the Putnam case. Petitioners do not dispute the correctness of "the well recognized principle as set forth in the" Putnam case, but advocate that such principle "is not applicable here." In their brief petitioners say: We do advocate that the negotiations by the stockholder/officers with the Bank of America relative to their indebtedness under the continuing guaranty is a separate and distinct transaction, and must be viewed not in its relation to the corporation, and therefore a bad debt, but rather as a transaction between two parties under a separate set of facts and circumstances. In other words, petitioners argue that because they were able to compromise or settle their obligations as guarantors, the character of their losses was changed in some unexplained way from bad debt losses to ordinary losses deductible under section 165(c)(2), supra. We see no merit in this argument. We think it can be said *250 as being well established that section 165(c)(2) of the 1954 Code (which is substantially the same as section 23(e)(2) of the 1939 Code), dealing with ordinary losses, and section 166(d) of the 1954 Code (which is substantially the same as section 23(k)(4) of the 1939 Code), dealing with nonbusiness bad debt losses, are mutually exclusive. In this connection the Supreme Court, in the Putnam case, also said: There is, then, no justification or basis for consideration of Putnam's loss under the general loss provisions of section 23(e)(2), i.e., as an ordinary nonbusiness loss sustained in a transaction entered into for profit. Congress has legislated specially in the matter of deductions of nonbusiness bad debt losses, i.e., such a loss is deductible only as a short-term capital loss by virtue of the special limitation provisions contained in section 23(k)(4). The decision of this Court in Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 54 S. Ct. 644, 78 L. Ed. 1200, is apposite and controlling. * * * Petitioners, in support of their above argument, cite and rely upon John P. Dillon, 9 B.T.A. 177 (1927); Henry Adamson, 17 B.T.A. 17 (1929); *251 E. P. Adler, 44 B.T.A. 112 (1941); Commissioner v. Condit, 333 F. 2d 585 (C.A. 10, 1964, affirming 40 T.C. 24; and Eugene H. Rietzke, 40 T.C. 443 (1963), appeal to Fourth Circuit dismissed on stipulation. The first three cases are not precedent for the instant case because they were decided prior to the Putnam decision in 1956. To the extent that those three cases conflict with the Putnam decision they must be considered as impliedly overruled by that decision. The Condit case is materially distinguishable from the instant case on the facts. In Condit we said Condit "was not paying off an obligation as a guarantor and that he was not entitled to subrogation." In Putnam the Supreme Court made this statement: The familiar rule is that, instanter upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. * * * [Footnote omitted.] This familiar rule is the law in California. Section 2787 of West's Annotated California *252 Civil Code provides that "The distinction between sureties and guarantors is hereby abolished" and section 2847 of the same Code provides: If a surety satisfies the principal obligation, or any part thereof, whether with or without legal proceedings, the principal is bound to reimburse what he has disbursed, including necessary costs and expenses * * * [Emphasis supplied.] In the instant case it is clear that petitioners were making payment to the Bank of America in satisfaction of their liabilities as guarantors and that they were entitled to be reimbursed for such payments by Wobbers, Inc., under California law. In Condit the Court of Appeals said "This * * * is not a case in which taxpayer seeks a deduction, as an ordinary loss, of a payment made by him of a corporate debt which he has guaranteed." The instant case is just that. The Rietzke case is likewise distinguishable from the instant case since the taxpayer in that case, unlike the instant case, "obtained no right of subrogation in law or by contract." For the reasons stated above, we hold that under Putnam v. Commissioner, supra, petitioners' losses are nonbusiness bad debt losses deductible only as *253 short-term capital losses under section 166(d) of the Internal Revenue Code of 1954. Decisions will be entered for the respondent. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Milton Kamler, Docket No. 1464-64 and Juanita Petrucci, Docket No. 1506-64.↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * *
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; ↩
3. SEC. 166. BAD DEBTS. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. [Emphasis supplied.] SEC. 165. LOSSES. * * *
(f) Capital Losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. SEC. 1211. LIMITATION ON CAPITAL LOSSES. * * *
(b) Other Taxpayers. - In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales of exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller. * * * [Emphasis supplied.]↩